### In re SERENITY K.

No. 2004–297–Appeal.

Supreme Court of Rhode Island.

Feb. 24, 2006.

Janice M. Weisfeld, Providence, for Petitioner.

Karen Clark, Providence, for DCYF.

Frank P. Iacono, Jr., for CASA.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice SUTTELL, for the Court.

Hongamath Virasak, the biological father of Serenity K.,[1] appeals from a Family Court decree terminating his parental rights on the ground of abandonment. This case came before the Supreme Court for oral argument pursuant to an order directing the parties to show cause why the issues raised in this appeal should not summarily be decided. After considering the written and oral submissions of the parties and examining the record, we are of the opinion that this appeal may be resolved without the necessity of further briefing or argument. For the reasons set forth herein, we affirm.

### Facts and Procedural History

At the time of Serenity's birth on August 7, 2002,[2] Mr. Virasak was being held at the Adult Correctional Institutions (ACI) on a domestic assault charge.[3] On November 13, 2002, Mr. Virasak was transferred from the ACI to a federal detention facility in Oakdale, Louisiana, ad-

---

1. At Mr. Virasak's request, a paternity test was conducted, the result of which conclusively established that he was Serenity's biological father.

2. Testing on the infant's urine revealed evidence of prenatal cocaine exposure. She was placed in the temporary custody of the Department of Children, Youth and Families (DCYF) pursuant to an *ex parte* order on August 9, 2002.

3. Although it is not entirely clear from the record, it would appear that Mr. Virasak was detained on a charge of felony assault upon the child's mother.

ministered by the Immigration and Naturalization Service (INS), on an immigration hold. Mr. Virasak was released from the federal detention facility on May 18, 2003. On May 20, 2003, he telephoned a social worker from the Department of Children, Youth and Families (DCYF), Indira Prado, to request a visit with Serenity. Ms. Prado arranged for a supervised visit to take place on May 22, 2003, at the DCYF office in Pawtucket, Rhode Island. Within minutes of the father's arrival, however, Pawtucket police placed him under arrest pursuant to an outstanding warrant and held him overnight. Mr. Virasak testified that between May 23, 2003, and October 23, 2003, the date of his eventual return to the ACI, he telephoned Ms. Prado to request a visit four to five times over a two-month period, calling once every other week. Although the social worker was never available to accept his calls, he said that he left only one voice mail message for her. Ms. Prado denied receiving any telephone calls or voice mail messages from Mr. Virasak. On October 23, Mr. Virasak entered a pleas of *nolo contendere* to the assault charge, and again was incarcerated at the ACI. He made no further attempts to contact Ms. Prado or DCYF.

On December 2, 2003, DCYF filed a petition in Family Court seeking to terminate the parental rights (TPR) of both Serenity's mother and father.[4] After a trial in March 2004, the trial justice terminated Mr. Virasak's parental rights to Serenity on the ground that he had abandoned or deserted the child. Specifically, the court stated:

"The father admitted on cross examination * * * that he has not made any call seeking any visitation or any contact with this child since at least the last six months, September of 2003. Also, he admitted that prior to the time he was released from the immigration facility in May of 2003, he had made no attempts to try and visit his child. This is despite the fact that he knew where DCYF was * * *."

Based on this lack of contact, the court found "by clear and convincing evidence that a period of six months has passed wherein Mr. Virasak has had no contact with his child," despite having had the opportunity to do so. Accordingly, the court terminated father's parental rights, placed Serenity in DCYF guardianship, and declared DCYF to be the sole party to give or withhold consent to her adoption.

## Discussion

The authority for the termination of parental rights based on abandonment is contained in G.L.1956 § 15–7–7(a)(4), which provides, in pertinent part:

"(a) The court shall, upon a petition duly filed by a governmental child placement agency or licensed child placement agency after notice to the parent and a hearing on the petition, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child, if the court finds as a fact by clear and convincing evidence that:

" * * * * *

"(4) The parent has abandoned or deserted the child. A lack of communication or contact with the child for at least a six (6) month period shall constitute prima facie evidence of abandonment or desertion."

When called upon to review TPR rulings, this Court examines the record "to estab-

4. Serenity's mother was defaulted for failing to appear, and her parental rights were terminated on January 6, 2004. This appeal, however, concerns only the parental rights of Mr. Virasak.

lish whether the [trial] justice's findings are supported by legally competent evidence." *In re David L.,* 877 A.2d 667, 671 (R.I.2005) (quoting *In re Shawn B.,* 864 A.2d 621, 623 (R.I.2005)). Such findings "are entitled to great weight, and this Court will not disturb them on appeal unless the findings are clearly wrong or the trial justice misconceived or overlooked material evidence." *Id.* (quoting *In re Shawn B.,* 864 A.2d at 623).

Although .conceding that DCYF "may have presented a *prima facie case,*" Mr. Virasak argues that he successfully rebutted any *prima facie* evidence of abandonment. Specifically, he relies upon his telephone call to Ms. Prado within two days of his release from the Louisiana detention facility and his testimony that he "repeatedly" called Ms. Prado for visits over a period of approximately two months. Mr. Virasak also asserts that he kept DCYF informed, through his family, of his whereabouts while he was held by the INS in Louisiana and that Ms. Prado admitted that she never made any attempts to contact him at least from November 2002 to the time of trial, in March 2004.

We are unpersuaded that Mr. Virasak's meager attempts to maintain contact with Serenity are sufficient to overcome the more than nineteen months of his indifference to her welfare—much less do they evince an intention to establish a parent-child relationship with her. From the date of the child's birth on August 7, 2002, until Mr. Virasak's release from the federal detention facility on May 18, 2003, he made no attempt to contact either the child or DCYF. Over the course of the next five months, until his re-incarceration on October 23, 2003, he had but one abbreviated visit with Serenity, and attempted to contact DCYF at most four or five times to arrange for visits, leaving a voice message only once. Mr. Virasak's lack of effort to

maintain contact with Serenity cannot be overlooked or excused. He testified that he knew the location of DCYF, that Serenity was in the custody of DCYF, and that Ms. Prado was the social worker assigned to the case. Moreover, he testified that he possessed Ms. Prado's telephone number, and had access to a telephone at both the federal detention facility in Louisiana and the ACI, yet had made no attempt to telephone her during the six months preceding trial.

■ Mr. Virasak's endeavor on appeal to elude responsibility by asserting that Ms. Prado *"never made any* attempts to contact [him] at least from November, 2002, to the time of trial in March of 2004," is unavailing. Our cases make clear that it is primarily and ultimately the responsibility of the parent, not DCYF, "to substantially and repeatedly maintain contact with [his or her child]" who is in the care of DCYF. *In re Shawn B.,* 864 A.2d at 623 (quoting *In re Diamond I.,* 797 A.2d 1076, 1078 (R.I.2002) (mem.)). This burden applies even when the parent whose rights are at issue was incarcerated for the six-month statutory period. *Id.; see also In re DeKarri P.,* 787 A.2d 1170, 1172 (R.I. 2001). Indeed, we have held that a parent need not willfully abandon his or her child for the court to grant a TPR. *In re Abby D.,* 839 A.2d 1222, 1225 (R.I.2004); *In re Craig G.,* 765 A.2d 1200, 1202 (R.I.2001). Rather, a parent in this jurisdiction, incarcerated though he or she may be, "can abandon a child by not actively engaging in efforts to contact that child, despite having opportunities to do so." *In re DeKarri P.,* 787 A.2d at 1172.

We previously have expressed this Court's lack of sympathy for a parent "who makes halfhearted or no attempts to visit or contact his or her child within the six-month statutory time period." *In re Abby D.,* 839 A.2d at 1225 (quoting *In re*

*DeKarri P.,* 787 A.2d at 1172). As the trial justice aptly noted: "The child has a right to receive contact with his or her parent. The parent does not have a right to lay back and wait for [DCYF] to seek him or her out to initiate the contact." Moreover, father's argument that Serenity's grandparents informed DCYF of his incarceration in Louisiana fails to absolve him of the responsibility of communication and contact that was his alone to bear. *See In re Robert S.,* 840 A.2d 1146, 1150 (R.I.2004) (holding that an incarcerated parent could not rely on the care given by his parent to his child to substitute for his own parental obligations under § 15–7–7); *In re Shaylon J.,* 782 A.2d 1140, 1142 (R.I.2001) (same).

We are satisfied that Mr. Virasak's four or five attempts to contact his daughter over a period of nineteen months were insufficient to rebut the clear evidence of abandonment, and that the trial justice's findings were supported amply by competent evidence. Nor do we perceive that the trial justice misconceived or overlooked any material evidence.

## Conclusion

For the reasons set forth herein, we affirm the decree of the Family Court, to which we remand the record in this case.